## LANDER vs. SMITH.

*Sixth District Court for Sacramento Co., November,* 1857.

FOREIGN ADMINISTRATOR—POWER OVER DOMESTIC ASSETS.

The capacity of a foreign administrator to maintain an action for debts due the estate of the foreign intestate, depends upon the *locality* of these assets, as domestic or otherwise.

A foreign administrator cannot maintain an action for domestic assets, because policy demands that domestic assets be administered at home for the benefit of domestic creditors. The fact that the demand is based upon a foreign *judgment,* obtained by the administrator *after the death* of the intestate, does not affect this incapacity.

Under the statute of this State requiring an action to be brought in the name of the real party in interest, for a foreign administrator to bring an action in his own name, and then prove by such a judgment, a debt due the estate of another would be a fatal variance.

The conventional distinction formerly taken between the *localities* of assets, depending upon whether these are debts upon simple contract or are judgments, cannot now be upheld, since these are not regarded as *debts* of *different degrees,* but different *degrees of evidences* of debt.

A domestic administrator can maintain an action upon a foreign judgment.

On demurrer to the complaint.

——— ———, for plaintiff.

*Latham & Sunderland,* for defendant.

BOTTS, J.—The plaintiff, describing himself as a resident of the state of Kentucky, and administrator of Elizabeth Dunnington, deceas-

ed, declares upon a judgment obtained by him as such administrator against the defendant, in the state of Kentucky, on the 16th day of May, 1856. To this complaint the defendant demurs, upon the ground that the plaintiff has no right to administer the assets for which he is suing. This is the effect of the demurrer, although the defendant expresses his objection by saying that the plaintiff has no capacity to sue.

I have been a good deal embarrassed by the question raised on this demurrer, and the more that I have not had the full advantage of the well known ability of the counsel on either side.

The counsel for the plaintiff admits that generally a foreign administrator cannot maintain an action for domestic assets; but he claims as an exception to this rule, all that class of demands resulting from promises made to or judgments obtained by the administrator subsequent to the death of the intestate; and to maintain his position he cites the case of Talmage vs Chapel, 16 *Mass.* The case is identical with the one at bar, and if the doctrine there established be law, the demurrer must be overruled. But I am not satisfied with this case, and if the principle contended for, is correct, I am certain that it does not rest either upon the basis upon which it is placed by the *Massachusetts* court, or by the plaintiff's counsel.

A foreign administrator cannot sue a domestic defendant, not in consequence of any want of capacity to sue, nor because the domestic courts refuse to recognise his official character; but because the policy of every country demands that domestic assets be administered at home, that they may be appropriated to domestic creditors. The doctrine on this subject originated with the spiritual courts of Great Britain. To the bishop of each diocese belonged the power of probate, and administration; but if the intestate died with *bona notabilia* in two different dioceses of the same province, then was the administration sought from the metropolitan, which would cover all the dioceses of the province. Now, it will be remembered that all England is divided into the two provinces of York and Canterbury; how if one should die with goods or assets in both provinces? Then would there be a struggle for the administration between two separate supreme jurisdictions. In this contest it was held, that the probate granted in one province, was void as to goods in the other; it was, probably, then as

now, the vultures fighting for the carrion.  Disputes arose, too, be-
tween the different dioceses of the same province, as to the location of
the intestate's effects ;  as, for instance, if the intestate died in one
diocese with a promissory note in his pocket, and the debtor resided in
the other ; in which diocese were the assets located ?  These difficul-
ties were finally settled by canons, or enactments, of the convocation
of bishops.  By these canons, simple contract debts became *bona no-
tabilia* of the diocese where the debtor lived; specialty debts were
located where the specialty happened to be at the time of the death
of the intestate ; judgments or acknowledgments were *bona notabilia*
where they were obtained, given or acknowledged.  These canons
were enacted in the time of James I., by the bishops and clergy in
convocation assembled, and were confirmed by the king under the
great seal; but they were never confirmed by parliament; consequently,
the civil courts never acknowledged their validity.  Still the civil courts
adopted so much of these canons as they chose to consider exponents
of the ancient usage of the church of England.  See 2 *Atkyns* 653.
For instance, they likened effects in two kingdoms and a foreign admin-
istrator, to the ecclesiastical case of two provinces and an administrator
appointed by the metropolitan of one of them.  The comity of nations
required a recognition of the official capacity of the foreign adminis-
trator even as it secured a recognition of a foreign judgment; but it
was said that this comity did not require the recognition of the right
of a foreign administrator to administer domestic assets; these assets
being reserved for domestic creditors.  It was unreasonable, it was
said, to permit a foreigner to withdraw the domestic assets, and thus
to remit a domestic creditor to a foreign tribunal, which, in many cases,
would be equivalent to a total sacrifice of domestic interests.  This
would be to carry national politeness a little farther than the courts
were willing to extend it.  But they, too, in analogy to the doctrine of
the ecclesiastical rule, compromised upon the locality of the assets;
holding simple contract debts to be the assets of the country where the
debtor lived; whilst they agreed that judgments should be considered
assets of the country in which the judgment was obtained.  These
principles are recognized in Goodwin vs. Jones, 3 *Mass.*, 513, cited in
Talmage vs. Chapel.

Thus it will appear that, if there be any difference between cases in

which the foreign administrator can sustain a suit against a domestic defendant, it does not depend, as the plaintiff's counsel supposes, upon whether the judgment sued on, was obtained by the testator in his lifetime, or his administrator after his death, but upon the fact of the locality of the asset having been changed by the conversion of a simple contract debt into a judgment. Nothing is more artificial than the reasoning of the plaintiff's counsel, that the foreign judgment having been rendered in the name of the administrator, he may sue on it in his own name, and that his description of himself as administrator is mere surplusage. Certainly under our statute, which requires the action to be brought in the name of the real party in interest, to sue in his own right, and prove a debt due the estate of another, would be a fatal variance. It is true that in some cases, as for the recovery of property belonging to the estate tortiously taken from his custody, he may sue in his own name; so also may any other bailee; for a promise to him to pay a debt due the estate, he may sue in his own name; so may the factor of a foreign house sue for a debt due the principal; but in either suit I apprehend the executor or agent is only a nominal plaintiff, and the defendant may set up in such a suit, any equities against the estate, in the one case, or the principal in the other. If it were true that the administrator could sue upon a judgment obtained by him as administrator in his own right, without regard to the estate, it would follow that the defendant could offset any claim against the individual, and so defeat the claim of the estate for whose real benefit the suit is brought.

I have labored upon this case the more, because this abstruse question turns wholly upon the basis of the distinction between suits brought by an administrator upon simple contract debts, and those that have ripened into judgments.

But if the distinction is founded, as I think it is, upon the conventional locality of the assets; and this is based upon the obsolete idea of the higher dignity of specialty and judgment debts, what becomes of this doctrine, when this distinction no longer exists? Now, when no distinction is drawn between the dignity of a promissory note and that of a bond (since notes, specialties and judgments are considered not *debts of different degrees,* but only *different degrees of evidences* of debt,) what becomes of a doctrine founded on the old view, consid-

ered by the new light ? The noblest of all sciences must not be permitted to lag in the march of improvement; an error can only be reformed, by overthrowing all its consequences.

If, then, the true principle be, that it behooves every government to protect its own citizens, and for this purpose it is necessary that assets within its jurisdiction, be administered under the supervision of its own courts, in order that they may be made to respond to the claims of domestic creditors, then it follows, that this suit should not be sustained, if a judgment in favor of the plaintiff would have the effect of withdrawing local assets from the reach of domestic creditors. Suppose the judgment sought were to be obtained, what would be the result ? It would be satisfied out of the effects of the debtor then in California; the money shall be made and in the hands of the sheriff; does not this money become assets of the estate located in California, and shall a foreign administrator be permitted to withdraw these assets from the jurisdiction of our courts, without accounting to our own citizens to whom the estate may be indebted ? In Vaughn vs. Northup, 15 *Peters*, it was held that an administrator in one state could not be sued in another; then it follows that if this suit be permitted, we have a suitor who cannot be sued.

It has even been doubted whether a domestic debtor could defend by plea of payment made to a foreign administrator; although in Doolittle vs. Lewis, 7 *Johns. Ch. R.*, chancellor Kent held such a payment good. I cannot see the substantial difference between permitting a foreign administrator to withdraw assets belonging to the intestate at the time of his death, and those becoming assets by process of law after the death of the intestate. It is useless to give the plaintiff a judgment, if the effects of the judgment can only be administered by a domestic administrator. It is urged that a domestic administrator cannot sue upon the judgment; but if I am right, the effect of this judgment is to conclude the liability of the defendant to the estate, and the question is, simply, by what agent or trustee shall the debt be collected ? In this view, the judgment would be as available to the domestic as the foreign administrator.

Upon a full consideration of the case, somewhat in the face of authority I confess, I am inclined to sustain the demurrer. Let judgment be entered accordingly.